UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION


FILED
MAR 16 2017
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TRACY PETERS,<br><br>Defendant. | 3:16-CR-30150-RAL<br><br>REPORT AND RECOMMENDATION CONCERNING MOTION TO SUPPRESS STATEMENTS |

Tracy Peters, a non-Indian, is alleged to have assaulted his Indian girlfriend with a bottle, causing her serious bodily injury. He seeks to suppress statements he made while being detained by tribal police on Fourth Amendment and Exclusionary Rule grounds and under *Miranda*. Because his tribal detention was reasonable and in accord with applicable law and because his statements were not elicited in response to *Miranda* interrogation, his suppression motion must be denied.

## BACKGROUND

At approximately 1:19 a.m. on November 3, 2016, Cheyenne River Sioux Tribe (CRST) police officer Daniel Rice was dispatched to the Cheyenne River Motel in response to a "fight call." Upon his arrival, Officer Rice saw Peters and two females going into the west side entrance of the motel. The officer rolled his car window down and asked them to stop. One of the females responded that they were all right and

were going to bed. Officer Rice and CRST Sergeant Emmanuel Bear Killer (who had shown up at the scene to assist), made their way to the main entrance of the motel and proceeded down a hallway of it.

In the hallway, the officers heard crying coming from room 117 and knocked on the room door. Peters answered the door, opening it part way. Officer Rice told Peters that the officers were responding to a fight call that had been made to the police department. Peters informed them that he and his significant other, June High Elk, had been "jumped" outside a bar in downtown Eagle Butte. Given the situation and what had been reported, Officer Rice wanted to make sure that everyone was okay and advised Peters of this. Peters answered, "Yeah, sure," opened the door up completely, stepped aside and said, "Come in."

Inside, Officer Rice noticed that High Elk had blood on her face and that there was blood all over the bathroom sink, stool and floor. The officer also noticed that Peters had a cut on one of his hands and that he too was bleeding.

Once it was determined that no one else was present, Sergeant Bear Killer stepped out of the room with High Elk and talked to her privately. Officer Rice remained with Peters in the room.

After a short time, Sergeant Bear Killer reentered the room and let Officer Rice know that High Elk had corroborated Peters' story – about she and Peters being assaulted downtown – and that she was seeking medical attention. The officers and High Elk departed together, leaving Peters behind – and alone – in the room.

2

Sergeant Bear Killer transported High Elk to the hospital emergency room in his patrol car. Officer Rice followed them in his car.

While in the emergency room, Officer Rice took photographs of High Elk's wounds. After he had done so, High Elk asked where Peters was. When the officer informed her that Peters was still at the motel, she disclosed that Peters was the one who had assaulted her.

Upon hearing this, Officer Rice left the hospital and returned to the motel. As he was approaching room 117, the officer saw and met up with Peters in the hallway. The officer announced himself and asked Peters if he was an Indian. Peters said he was not. He was then told that he was being detained for the assault of High Elk, placed in handcuffs and escorted to the officer's patrol car. While getting into the car, Peters made statements that he later repeated.

Believing that he had no jurisdiction over Peters (due to his non-Indian status), Officer Rice requested the tribal dispatcher to contact an Eagle Butte city officer. Roughly 10 minutes later, Norman Schuler, the city police chief, arrived and declared that he had no jurisdiction (because the alleged assault involved a non-Indian on an Indian) and suggested that the officer get in touch with the on-call detective. CRST Detective Larry LeBeau was thereafter contacted. Detective LeBeau, in turn, sought and obtained authority – from an Assistant United States Attorney – to conduct a probable cause arrest of Peters.

At some point LeBeau met with Peters outside of the motel. Peters was still in Officer Rice's patrol car. The detective asked, and Peters agreed, to take a preliminary breath test, which yielded a result of .106 percent by weight of alcohol.

Detective LeBeau notified Peters that he was being arrested for domestic assault and assault resulting in serious bodily injury. The detective apprised Peters that he would first be taken to the hospital to have his hand looked at and then would be transported to the jail in Pierre, South Dakota, where he would be held in federal custody.

Officer Rice recorded Peters' actions and statements from the time Peters was initially put into the officer's patrol car until Peters was dropped off at the jail. The recordings were made from a lapel cam (the officer was wearing) and a dash cam (mounted in the officer's patrol car) that collectively lasted approximately 5 hours and 16 minutes.

Peters was ultimately indicted on federal charges of assault with a dangerous weapon, assault resulting in serious bodily injury, assault resulting in substantial bodily injury to an intimate partner and domestic assault of an habitual offender. Following his arraignment and not guilty pleas, he moved to suppress from use at trial the statements he made to tribal officers. An evidentiary hearing was held on the motion at which one witness testified and three exhibits (compact discs of the lapel and dash cam recordings) were received into evidence.

4

## DISCUSSION

### A. Detention

Peters says that when High Elk disclosed that he was the one who assaulted her, tribal officers should have contacted the city police to arrest him because he is a non-Indian. Instead, he continues, Officer Rice went to the motel, handcuffed and detained him in the officer's patrol car, and only then had dispatch call and have a city officer come over and take custody of him. He claims that he was unlawfully detained, in violation of the Fourth Amendment, and that any statements he made during the course of his detention must be suppressed under the Exclusionary Rule as "fruit of the poisonous tree."[1] Peters' claim though falls flat for at least two reasons.

First, no city police officer had the authority to arrest Peters, because High Elk is Indian, something Chief Schuler recognized and communicated to Officer Rice.[2] The

---

[1] See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963) (admissions by a defendant that flow from a Fourth Amendment violation must be suppressed).

[2] See Williams v. Lee, 358 U.S. 217, 220, n.5 (1959); Williams v. United States, 327 U.S. 711, 714 (1946); Donnelly v. United States, 228 U.S. 243, 271-72 (1913); United States v. Ramirez, 537 F.3d 1075, 1082 (9th Cir. 2008); State v. Flint, 157 Ariz. 227, 228-29, 756 P.2d 324, 325-26 (Ct. App. 1988), cert. denied, 492 U.S. 911 (1989); State v. Larson, 455 N.W.2d 600, 601 (S.D. 1990); see generally American Indian Law Deskbook, §4:9 at 232 (2016 ed.) (Indian country crimes committed by non-Indians against Indians are subject to prosecution only under the General Crimes Act (18 U.S.C. §1152) and not in state court); William C. Canby, Jr., American Indian Law in a Nutshell, at 174 (6th ed. 2015) (the primary function of the General Crimes Act is to provide for prosecution of crimes by non-Indians against Indians).

tribal officers had no authority to arrest Peters either because he is a non-Indian[3] and the Violence Against Women Act[4] did not vest the CRST with criminal jurisdiction.[5] Only the federal government had jurisdiction over the assault offense(s) Peters was alleged to have committed.[6] Since Chief Schuler lacked the power to make an arrest, the timing in which he was contacted – before or after Peters' apprehension – did not matter.

Second, the Supreme Court has consistently reaffirmed that tribal police officers have the authority to arrest an offender within Indian country and to detain him until he can be turned over to the proper authorities, even if the tribe itself lacks jurisdiction.[7] Federal and state courts (including the Eighth Circuit) have likewise regularly upheld

---

[3]*See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208, 212 (1978); *see generally American Indian Law in a Nutshell*, at 195 ("It has been authoritatively established that tribes have no general criminal jurisdiction over non-Indians.").

[4]Pub. L. No. 113-4, tit. IX, §904, 127 Stat. 120 (2013) (codified at 25 U.S.C. §1304).

[5]*See generally American Indian Law in a Nutshell*, at 196-97 (discussing VAWA and the prerequisites before tribal jurisdiction can be exercised).

[6]*See generally American Indian Law Deskbook*, at 230 (federal courts have jurisdiction over crimes committed by a non-Indian against an Indian under the General Crimes Act); *American Indian Law in a Nutshell*, at 203 (chart of criminal jurisdiction in Indian country reflecting that the federal government has exclusive jurisdiction over crimes by non-Indians against Indians under 18 U.S.C. §1152).

[7]*See Duro v. Reina*, 495 U.S. 676, 697 (1990); *Oliphant*, 435 U.S. at 208; *see also Strate v. A-1 Contractors*, 520 U.S. 438, 456, n.11 (1997) (where the Court did not "question the authority of tribal police to patrol roads within a reservation, including rights-of-way made part of a state highway, and to detain and turn over to state officers non-members stopped on the highway for conduct violating state law").

tribal police actions, including stopping, investigating and detaining non-Indians suspected of criminal conduct.[8]

Here, tribal officers initially detained and then advised Peters that he was under arrest and would be taken to jail and held there on federal charges. His detention was not lengthy or prolonged by an exploratory interview and was not otherwise unreasonable under the circumstances.[9] Nor did tribal officers act outside their power to detain Peters and transport him to the federal authorities[10] or flout his rights under the Fourth Amendment.[11]

---

[8]*See United States v. Terry*, 400 F.3d 575, 579-80 (8th Cir. 2005); *United States v. Becerra-Garcia*, 397 F.3d 1167, 1174-75 (9th Cir. 2005), *cert. denied*, 547 U.S. 1005 (2006); *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179-80 (9th Cir. 1975); *Colyer v. State Dep't of Transp.*, 2009 WY 43, ¶25, 203 P.3d 1104, 1110-11; *State v. Haskins*, 269 Mont. 202, 211, 887 P.2d 1189, 1195 (1994); *Primeaux v. Leapley*, 502 N.W.2d 265, 270 (S.D. 1993); *State v. Schmuck*, 121 Wash.2d 373, 386-92, 850 P.2d 1332, 1338-42 (1993); *State v. Pamerien*, 156 Or. App. 153, 156-59, 967 P.2d 503, 504-06 (1998); *United States v. Nichols*, No. CR 14-30038-MAM, 2014 WL 4185360 at *3 (Aug. 20, 2014); *Ouart v. Fleming*, No. CIV-08-1040-D, 2010 WL 1257827 at **5-6 (W.D. Okla. March 26, 2010); *but see United States v. Keys*, 390 F.Supp.2d 875, 884 (D.N.D. 2005) (finding that tribal officers' continued detention of a suspect for an investigatory interview after the suspect's non-Indian status had been confirmed to be unreasonable).

[9]*See Terry*, 400 F.3d at 580; *see and compare Keys*, 390 F.Supp.2d at 884.

[10]*See Duro*, 495 U.S. at 697; *Terry*, 400 F.3d at 579.

[11]*See Terry*, 400 F.3d at 580.

**B. Statements**

Peters also argues that he was questioned about the incident with High Elk without first being advised of his *Miranda* rights.[12] He contends that the un-Mirandized questioning of him requires suppression of the statements he made while being detained. Yet when scrutinized carefully, this contention runs smack up against the interrogation component of *Miranda* and provides Peters with no legal traction or gateway for relief.

*Miranda* prohibits the prosecution from introducing, in its case at trial, statements the defendant made during a custodial interrogation unless he was previously advised of his Fifth Amendment privilege against self-incrimination and his right to an attorney.[13] It is undisputed that Peters was in custody and that he was never given any *Miranda* warnings. The only question is whether he was subject to interrogation.

For purposes of *Miranda*, "interrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself."[14] Interrogation includes not only express questioning, but also words or conduct that an officer should know are "reasonably likely to elicit an incriminating response from the suspect."[15] "*Miranda*

---

[12]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

[13]*See Miranda*, 384 U.S. at 444.

[14]*Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)), *cert. denied*, 496 U.S. 909 (1990)).

[15]*Innis*, 446 U.S. at 301.

8

does not bar the prosecution from using as evidence at trial, volunteered or spontaneous statements made during a conversation not initiated by an officer."[16] And the officer's request for clarification of a volunteered or spontaneous statement generally does not amount to interrogation as conceptualized in *Miranda*.[17]

Peters' post-detention statements are admissible as substantive trial evidence. They were either made spontaneously or in response to attempts, on the part of tribal officers, to clarify or confirm what he had already volunteered.[18] Significantly, Peters continually maintained that High Elk had hurled the glass bottle at him first and that he merely threw it back at her. More importantly, the officer's questions were not designed to expand the scope of the statements Peters had previously made or enhance his guilt or expose him to additional charges.[19] It must be remembered that the

---

[16]See *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005); *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000); *United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996); *United States v. LaRoche*, No. CR. 08-30056-01-KES, 2008 WL 4224782 at *5 (D.S.D. Sept. 9, 2008); *United States v. Tail*, No. CR 04-50026-01-KES, 2005 WL 2114227 at *3 (D.S.D. Aug. 31, 2005), *aff'd*, 459 F.3d 854 (8th Cir. 2006); *United States v. Provancial*, No. CR. 95-30084, 1996 WL 280008 at *3 (D.S.D. May 3, 1996).

[17]See *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014); *Chipps*, 410 F.3d at 445; *LaRoche*, 2008 WL 4224782 at *5; *Tail*, 2005 WL 2114227 at *3; *Provancial*, 1996 WL 280008 at **3-4; see generally 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure*, §6.7(d) at 878-79 & n.158 (4th ed. 2015).

[18]See *Chipps*, 410 F.3d at 445; *LaRoche*, 2008 WL 4224782 at *5; *Tail*, 2005 WL 2114227 at *3; *Provancial*, 1996 WL 280008 at *4.

[19]See *Chipps*, 410 F.3d at 445; *Butzin*, 886 F.2d at 1019; *LaRoche*, 2008 WL 4224782 at *5; *Tail*, 2005 WL 2114227 at *3; *Provancial*, 1996 WL 280008 at *4; see generally *Criminal Procedure*, §6.7(d) at 881-82 & nn.169-70.

purpose behind the *Miranda* decision is to "prevent[ ] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment."[20] The officers' actions did not implicate this purpose in any way. Inasmuch as Peters' statements were neither prompted by nor the product of interrogation within the meaning of *Miranda*, the absence of *Miranda* warnings does not evoke suppression of his statements at trial.[21]

## C. Tainted Fruit

Peters lastly asserts that his statements were the poisonous fruit of his illegal detention and requires suppression of his statements under the Exclusionary Rule. But because tribal officers did not skirt the Fourth Amendment (or for that matter *Miranda*), there is no "poisonous tree" for any "tainted fruit" to grow or fall from. It follows then that Peters' *Wong Sun* assertion is without merit and that his statements may be used against him regardless of whether he testifies.

## CONCLUSION

Tribal officers did not violate Peters' Fourth Amendment rights or the dictates of *Miranda* so as to mandate the suppression of the statements he made before and after his arrest. These un-Mirandized statements were, for the most part, volunteered and spontaneous and, in any event, were not the offspring of interrogation. And no basis

---

[20] *See Arizona v. Mauro*, 481 U.S. 520, 529-30 (1987).

[21] *See Provancial*, 1996 WL 280008 at *4.

exists to exclude them as "tainted fruit" or otherwise. The law – when applied to these facts – thwarts, or at least stymies, Peters' ability to prevail on his suppression motion.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Peters' Motion to Suppress Statements[22] be denied in its entirety for the reasons, and based on the authorities, discussed and cited to in this report.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[23] Unless an extension of time for cause is later obtained,[24] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[25] Objections must "identify[] those issues on which further review is desired[.]"[26]

---

[22]*See* Docket No. 27.

[23] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[24]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[25]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[26]*Arn*, 474 U.S. at 155.

DATED this 15th day of March, 2017, at Pierre, South Dakota.

BY THE COURT:

*(signature)*

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**